## S. W. BRIDGES & CO. v. CANDLAND et al.

No. 5386.   Decided February 17, 1936.   (54 P. [2d] 842.)

*White, Wright & Arnovitz* and *Chris Mathison,* all of Salt Lake City, and *L. Leland Larson,* of Manti, for appellant.

*Rawlings & Wallace,* of Salt Lake City, and *L. R. Christensen,* of Mt. Pleasant, for respondents.

WOLFE, Justice.

This appeal involves, among other matters, the construction of a printed form contract and two addendum telegrams; also, the extent to which oral evidence should be admitted to explain an alleged ambiguity in those writings. Perhaps the best presentation of the facts may be made by

setting out in full the printed form introduced as Exhibit E and hereafter so referred to, and the two telegrams set out hereunder, respectively, as Exhibits F and G and hereafter referred to by those designations, all being dated May 24, 1929. The italics throughout are supplied:

"Mt. Pleasant, Utah, May 24, 1929

"For and in consideration of the payment of the sum of Two Thousand Dollars and Twenty-Five Hundred & No-100 Dollars as an advance on my-our wool by S. W. Bridges & Co., Inc., of Boston, Mass., the receipt of which is hereby acknowledged, I-We agree to ship on consignment to the said S. W. Bridges & Co., Inc., my-our entire clip of 1929 wool, about 4,800 fleeces, about 40,000 pounds. I-we agree to deliver my-our wool to said S. W. Bridges & Co., Inc., (or their representative) F. O. B. cars at D. & R. G. W. Railroad on or about May 29, 1929, in good, marketable condition, well tied and honestly packed. A further advance up to a total of twenty cents per pound will be made by S. W. Bridges & Co., Inc., or their representative. *I-we agree that if at any time the collateral for said advance, in the opinion of S. W. Bridges & Co., Inc., is not sufficient to adequately protect said advance together with charges, I-we will reduce said advance by payment of such amount as is deemed necessary by S. W. Bridges & Co., Inc., or will deliver sufficient additional collateral satisfactory to S. W. Bridges & Co., Inc.*

"See telegrams of this date.

"I-we agree to pay interest on all advances, including freight charges and cartage, at the rate of 6 percent per annum, and a commission of two and one-half cents per pound if wool is sold in original packages, or three cents per pound if wool is graded, said commission to include guarantee of sales, also labor, storage, and premium for fire insurance for 6 months after arrival of wool in Boston. S. W. Bridges & Co., Inc., agree to keep the wool insured against fire in companies of good reputation. It is mutually agreed that the selling of the said wool is to be left to the best judgment of S. W. Bridges & Co., Inc.

"I-we agree to defend the title of said wool against all claims whatsoever.

"It is understood and agreed that this contract cannot be altered in any respect, nor shall any lien or mortgage be placed on the wool during the life of this contract except by written consent of S. W. Bridges & Co., Inc.

"This agreement is signed in duplicate, one copy to be retained by each party.

"[Signed] W. D. Candland & Sons."

On this contract is a notation, " See telegrams of this date." The telegrams read as follows: ·

"S. W. Bridges and Co., Inc.
"200 Summer Street, Boston, Mass.

"Upon receipt by North Sanpete Bank here of telegram that you will not demand additional margin from W. D. Candland and Sons nor John H. Seely & Sons Co. against their wool consignments unless their equity therein declines below twenty percent Candland and Seely will deposit drafts for forty five hundred and six thousand dollars respectively with consignment contracts attached balance of twenty cents per pound advance will be drawn against bills lading covering forty thousand and sixty thousand lbs respectively prompt shipment *early sale requested* no restrictions very reasonably hope to net thirty two flat job my address Salt Lake City.

"[Signed] Alex R. Livingstone, Jr."

The above was Exhibit F. Exhibit G reads as follows:

"North Sanpete Bank,
"Mt. Pleasant, Utah.

"*As arranged by Alexander Livingstone* we will accept consignments Candland and Seely advancing a total of twenty cents per pound terms as per our printed contract. We will not call for any additional margin from Candland or Seely unless their equity *in the total amount expended* shall fall below twenty per cent of the fair value of the wool please wire if transaction is definitely closed.

"[Signed] S. W. Bridges & Co., Inc."

According to the testimony of Mr. Bridges, Alex R. Livingstone, Jr., was a wool buyer for the plaintiff and other firms.

The complaint alleged that $8,700 had been advanced to defendants on the wool; that total credits allowable to defendants by reason of the sale of the wool amounted to $9,709.74; and that the total charges against them for advances, interest on advances, scouring charges, inspection and separation, commissions, and miscellaneous expenses amounted to $12,333.10, leaving due the plaintiff $2,624.30, which defendants refused to pay. While defendants in their answer technically denied the correctness of these amounts, the matter was not disputed by evidence. The plaintiff set

out as a basis for its recovery only the writing Exhibit E without the supplemental telegrams. The defendants denied that such was the contract, but set up an amended counterclaim alleging the agreement was that plaintiff would grade and scour the wool and sell the same at the fair market value within 60 days after delivery of the wool to it.

The evidence for plaintiff was entirely by depositions and documentary. W. D. Candland was the only witness who testified orally for the defendants. He testified that he did not want to sign Exhibit E with the italicized portions in the contract, whereupon Livingstone sent Exhibit F and the Sanpete Bank received in reply Exhibit G. Candland was permitted to give testimony of purported conversations between himself and Livingstone before the contract was signed to the effect that Livingstone had agreed that Bridges would have the wool scoured and sold within 60 days. Nothing appeared in the writings concerning such agreement between the parties. The court admitted it under the theory that it was of aid in clearing up an ambiguity. Contends Candland that if plaintiff had performed this alleged agreement to sell in 60 days from delivery, enough would have been realized so that all plaintiff's advances and expenses would have been paid and Candland would have received $2,800, for which amount defendants prayed judgment in their counterclaim.

Examination of the writings and of the evidence, we think, abundantly reveals and sustains the proposition that under no theory of the case was the oral evidence of Candland admissible to show an agreement with plaintiff to grade, scour, and sell within 60 days after delivery. On this ground, as well as on additional grounds later to be considered, the judgment must be reversed.

An examination of Exhibits E, F, and G, above quoted, leaves it doubtful whether there really is an ambiguity. The testimony of Candland shows that defendants refused to accept the italicized condition in the proffered printed form.

Then Livingstone sent Exhibit F, which is really not a part of the contract because it is informative to plaintiff that Candland would accept a contract in which plaintiff would not call for more collateral or "drawback" of any part of the advances unless their equity declined below 20 per cent. Twenty per cent. of what? The common-sense version is 20 per cent. of the value of the wool Candland was selling. Candland was the owner of the wool, but the plaintiff's advances gave it a very substantial interest in that wool. It would be as anxious as Candland to sell the wool for enough to meet all advancements, commissions, and charges. Tersely, as telegrams usually are written, it is plain that what was meant was that as long as the value of the wool at any time on the market kept at such a figure that 20 per cent. or more of that value after all the advancements, commissions, and charges owing to plaintiff were deducted, belonged to the defendants, plaintiff would demand no further collateral or drawback of the advancement. Thousands of telegrams a year are sent where words used are invested with meaning derived from business and trade practices or understandings. No intelligent business man would have mistaken the meaning of Exhibit F. It is part of the contract, however, only as it serves to explain Exhibit G, which was the reply telegram. In Exhibit G plaintiff made a slip which it seems was its undoing. It states that the plaintiff will not call for any additional security unless defendants' equity "in the total amount *expended*" shall fall below 20 per cent. of the fair value of the wool. This, literally read, does not appear to make sense. What plaintiff most probably meant was that if the difference between the value of the wool and the amount expended did not fall below 20 per cent. of the former, it would not call for collateral. Strictly speaking, there is an ambiguity. But this did not furnish defendants with a license to introduce evidence which never could explain such ambiguity. The evidence in regard to an agreement to grade and scour and sell within 60 days had no relation to the ambiguity in this telegram.

Defendants seek to find an opening in the phrase, "as arranged by Alexander Livingstone." This it is contended leaves it open as to what was arranged by Livingstone, and thus the door is open for the admission of all the alleged oral agreements. Not so. It was clear that the wire of May 24th (Exhibit G), in answer to one sent the same day by Livingstone (Exhibit F), did not refer to any arrangements which, if made at all, plaintiff at the time it received the wire had never heard of. Candland testified that Livingstone told him that he (Livingstone) had told plaintiff of the 60-day agreement and thus plaintiff could have referred to it. But the only notation on the contract is to these telegrams, and we have no evidence of what, if anything, more than was contained in the telegram of Livingstone, had been communicated to plaintiff. It is quite evident the parties desired to make the printed form as modified by the telegrams the contract and not the printed form as modified by the telegrams as added to or modified or supplemented by what either Candland or Livingstone might say they talked about.

It was to guard against a situation of this sort that the clause was placed in the contract that it could not be altered except by the consent of the plaintiff. This is a typical case which shows the value of that precaution. Livingstone nowhere, through deposition or otherwise, is a witness. But the adverse party gives evidence of what Livingstone said before the contract was signed and what he said a year after (see hereunder) under the theory evidently that everything Livingstone is purported to have said is as if the principal, Bridges, had said it; Livingstone being the agent of Bridges. Everything which Candland said to Livingstone and everything Livingstone said to Candland is conveyed through the mouth of Candland, an adverse witness. This, under proper conditions, is permissible, but evidently plaintiff by its contract sought to foreclose any matters not covered by the writings and sought to avoid being at the mercy of the party on the other end of the contract. The writings cannot be

added to or changed by oral evidence. They contain the full contract. When ambiguous, the ambiguity may be cleared up by oral evidence. If so ambiguous that no sense can be derived from them, in certain cases the writings are discarded and the agreement arrived at before it was reduced to writing may be testified to, provided always that the fundamental condition is present that there was a meeting of the minds. If this principle were not adhered to, writings would be of very little value. And they would not be of much greater value if the courts permitted the doing away with a definite recordation of the matters on which the minds had met by allowing, under some guise, all other matters discussed or talked about in a preliminary way to come in when that was just what the writing was designed to prevent. It appears that an early sale was requested because Livingstone's wire says so. But it merely states that it was requested, not demanded. Apparently that had been mentioned. But if, instead of casually being mentioned, Candland had considered it important that Bridges sell within 60 days and wanted it as part of the agreement, he would have insisted that the printed form be modified in that regard as well as in regard to the matter of additional collateral. The printed part of the contract specifies, "that the selling of said wool is to be left to the best judgment of Bridges & Co." While these observations go more to the improbability of any time limit for the sale having actually been agreed upon, than to the question of the admissibility of the evidence, they are quite material in considering whether the words, "as arranged by Alex. Livingstone," ever could be used as a vehicle to transport into the case this purported oral agreement as to a time limit for selling the wool. We think those words cannot be made to apply to some alleged oral arrangement by Livingstone, but must be taken to refer to the arrangement suggested by Livingstone in his wire to Bridges. Certainly, it would not be beyond the confines of reasonable construction to hold that the words, "as arranged by Livingstone," were confirmatory

of the suggested modification contained in Livingstone's wire of the same date in which case all else in Bridges' wire would have been superfluous. The 20 cents per pound advancement was exactly what Livingstone had put in his wire, and the part about additional margins in the Bridges wire, we have little doubt, was also meant to conform to the matter in Livingstone's wire. This is borne out by the fact that Livingstone in his wire says, "Upon receipt of North Sanpete Bank here of a telegram," etc. Then follow the conditions. Bridges wired the bank. He would hardly have wired the bank if he meant to refer to some arrangements between Candland and Livingstone never suggested in Livingstone's wire, and in regard to which it is quite unlikely that he would have thought the bank would know about. The bank was to be apprised of the acquiescence of Bridges to the suggested modification of the part of the printed contract relating to collateral and adverted to in the telegram from Livingstone to Bridges. The bank would then accept the draft and present to the payor, the plaintiff's bank.

Defendants, however, contend there is evidence of Livingstone's statements purported to have been made to Candland in the office of his attorneys on May 8, 1930, about a year after the consignment contract was signed. Candland on his direct examination testified, over objection, that: (1) "Mr. Livingstone advised me not to pay Bridges one cent; that it was an outrage for him to ask it; that he had made a contract with me for Bridges, and Bridges had failed to keep it although he had urged him many times to do what he promised. (2) Mr. Livingstone told me that if Bridges had kept his agreement there would have been no loss, but there would have been a substantial amount come to me from the sale of that wool. (3) He had notified Mr. Bridges of the agreement that I had made with him and that Bridges had accepted the consignment with that understanding."

Later, on redirect examination, an affidavit purported to have been made by Livingstone on May 8, 1930, the same day as the above statements were testified to have been

made, which affidavit was formerly refused admission, was given to Candland, who was apparently permitted to sit before the jury and "refresh his recollection" by reading largely from the document, against the objection of plaintiff. We shall first consider this method of testifying and then take up the broader ground of objection made to the witness' testimony above set out given on direct and the additional testimony concerning Livingstone's statements to him on May 8, 1930, given on redirect by aid of the affidavit. The admission of all this testimony is assailed by assignments Nos. 1 and 8.

Refreshing a recollection is not equivalent to reading from a document. "Recollection" is defined by Webster's New International Dictionary as the act or practice of collecting the mind; concentration; act of recollecting or recalling to the memory; the power of recalling ideas to ▮▮▮ the mind; that which is recollected; something called to the mind. The process indulged in by Candland was not one of having his memory touched off by something contained in the affidavit and thus supplying, independently of the document after such recalling, but was a process of indirectly getting in evidence the contents of the affidavit; it being perfectly apparent to the jury. This was more prejudicial than introducing the affidavit, because the jury might not be given the benefit of any qualifications or contradictions which might appear in the affidavit. Not Candland, but the affidavit, was testifying. Documents used in connection with recollection are of two sorts: (1) Those which serve to set the processes of recollection agog. The fact or circumstances are then loosed from the storage of the mind independently of the document as a present recollection. It serves to titillate only. (2) Those which serve to give present evidence of a recorded past recollection or fact. Certain qualifications are required of this second class which need not now be discussed. As to the first class, any memorandum or document, whether made by the witness, or by another at his instance, or whether never seen before,

will suffice, but care must be exercised by the court to see that such instrument is serving the function merely of starting the recollective processes in action. It was said by Sir G. A. Lewin, in a note to *Lawes* v. *Reed,* 2 Lew Cr. C. 152, that:

"Where the object is to revive in the mind of the witness the recollection of the facts of which he once had knowledge, it is difficult to understand why any means should be excepted to whereby that object may be obtained. Whether in any particular case the witness' memory has been refreshed by the document referred to, or he speaks from what the document tells him, is a question of fact open to observation, more or less according to the circumstances. If in truth the memory has been refreshed, and he is enabled in consequence to speak to facts with which he was once familiar, but which afterwards escaped him, it cannot signify, in effect, in what manner or by what means these facts were recalled to his recollection. Common experience tells every man that a very slight circumstance, and one not in point to the existing inquiry, will sometimes revive the history of a transaction made up of many circumstances. * * * Why, then, if a man may refresh his memory by such means out of court, should he be precluded from doing so when he is under examination in court?" 2 Wigmore on Evid. (2d Ed.) 37, note to § 758.

Wigmore says in his Second Edition on Evidence, vol. 2, § 758, p. 37:

"The purpose being to allow the legitimate use of written aids, while preventing their misuse, it would seem that no hard-and-fast rules can be laid down for invariable application. That which is suspicious and reprehensible in one instance may be entirely trustworthy in the next. No unerring marks of impropriety can be named absolutely.

"It follows, therefore, that *any writing whatever is eligible for use,* while, on the other hand, *any writing whatever may, in the circumstances, become improper.*"

The discretion of the court must control the use, but where a document is excluded from admission because hearsay, the contents thereof cannot be got in evidence under the pretext of refreshing a recollection. Where it is apparent that the witness is just transmitting to the jury the contents of the instrument rather than the contents of his memory

set off by the instrument, its use should be prevented past the point where it serves the latter office. But on a broader ground objection was well taken. Any statements of Livingstone of the nature offered made on May 8, 1930, were hearsay. The theory under which they were offered was that they were Bridges' statements because made by Bridges' agent in the course of Bridges' business. Assuming that Livingstone was representing Bridges to adjust the matter, certainly Livingstone was not authorized to misrepresent Bridges. If Candland's testimony is correct, a man who purported to be Bridges' agent said what has been above numbered (1), (2), and (3), and in addition the following:

(4) "He was ashamed that he had not been allowed to carry out the contract he made with me, and that if Mr. Bridges had carried out the contract there would have been no loss in the sale of that wool; (5) that he repeatedly asked Mr. Bridges to have it scoured and put on the market, and he offered to do the work himself that that might be done; and (6) if it had been sold anywhere in that period there would have been a substantial sum returned to me; (7) that he got that wool on the express agreement that he would scour and sell within 60 days."

Statements by Livingstone designated as (1) are Livingstone's advice to Candland, Livingstone's imprecation against his supposed principal Bridges, Livingstone's conclusion as to Bridges failing to keep a contract. Livingstone's purported statement designated (2) is Livingstone's idea that Bridges had not kept his contract and his opinion of what would have happened had Bridges done so. Advice of an agent or his criticism of his principal are not facts. Admissions must generally be as to facts. An opinion may involve the consciousness of liability or fault, but when made by an agent such opinion must be within the scope of his authority.

Statement (4) embraces the idea that the contract had not been carried out, a conclusion on the ultimate question to be decided by the court on the defense side. Statement

(5) may have been made by Livingstone to Bridges, but if Bridges had no duty to scour the wool, Livingstone's request to handle the wool in that fashion would not make such a duty. This does not involve an admission that Bridges had the obligation to do so, but only that Livingstone's idea, communicated to Bridges, was that it should be scoured. Statement (6) is simply the expression of an opinion and does not even, like statement (2) involve the admission of not keeping a contract which is embedded in statement (2). Statement (7) purports to be Livingstone's conclusion of what the express contract between Candland and Bridges was. Statement (3) is as to the fact that Bridges had been notified of this purported agreement to sell within 60 days. In the analysis of these statements we have two things to consider. The first, do any of them involve matter which can be classified as admissions? Secondly, if admissions, were they within the scope of the purported agent's authority or scope of agency? We can test the first by considering what would be the effect if made by Bridges himself. If Bridges had said that Candland did not owe him a cent, that it was an outrage that he should ask it, and that he (Bridges) had failed to keep his contract with Candland, and that if he (Bridges) had kept his contract there would have been no loss, and that he got the wool on the express agreement that he would scour and sell it within 60 days, the element of contradiction to his position in court necessary to an admission would be present, granting the opinions or conclusions on ultimate questions made by a party to a suit out of court may be given in court—a point at this time not necessary to decide. Any one who had heard Bridges so state could testify to such matters, and if the jury believed such witness, Bridges would have been out of court. But were they within the scope of the agent's authority? Assuming that Livingstone on May 8, 1930, was an agent of Bridges to seek an adjustment of the matter— and there is some evidence of this in Bridges' deposition that he asked Livingstone about a year later "to see Cand-

land about it"—were these statements purporting to have been made by Livingstone within the scope of his authority? It is hardly to be presumed that an agent sent out to adjust a claim has authority to state that his principal is a scoundrel and that there is nothing owing to him.

While a principal is bound by the acts or statements of his agent done or made within his authority and even within his apparent authority where the principal has put him in a position or given him such authority as permits an authority not given to appear as if given, yet where the act or statement itself shows on its face that it is adverse to the principal, it presents at once notice to the other that there is no such authority. An authority to say something can hardly be apparent or actual when the statement itself is not for the principal, but deliberately and designedly against him. The principal in selecting an agent is not bound by such treachery as that. For these reasons Livingstone could not be said to have apparent authority, in a mission peaceably to adjust a difficulty, to make the statements which on their face showed just the opposite from an authority apparent. The statements, therefore, were in no sense admissions of Bridges because made by Livingstone as his agent within the scope of his authority or apparent authority. Says Wigmore, vol. 2, on Evidence (2d Ed.) § 1078, p. 585:

"He who sets another person to do an act in his stead as agent is chargeable by such acts as are done under that authority, and so too, properly enough, is affected by admissions made by the agent in the course of exercising that authority. The question therefore turns upon the scope of the authority. This question, frequently enough a difficult one, depends upon the doctrine of Agency applied to the circumstances of the case, and not upon any rule of Evidence.

"The common phrasing of the principle is well represented in the following passage:

"1839, *Buchanan, C. J., in Franklin Bank* v. *Pennsylvania D. & M. S. N. Co.*, 11 Gill & J. 28, 33, 33 Am. Dec. 687: 'The principle upon which the declaration or representations of an agent, within the scope of his authority, are permitted to be proved, is, that such declarations,

as well as his acts, are considered and treated as the declarations of his principal. What is so done by an agent, is done by the principal through him, as his mere instrument. So whatever is said by an agent, either in the making a contract for his principal, or at the time, and accompanying the performance of any act, within the scope of his authority, having relation to, and connected with, and in the course of the particular contract or transaction in which he is then engaged, is, in legal effect, said by his principal, and admissible in evidence; not merely because it is the declaration or admission of an agent, but on the ground, that being made at the time of and accompanying the contract or transaction, it is treated as the declaration or admission of the principal, constituting a part of the "res gestae," a part of the contract or transaction, and as binding upon him as if in fact made by himself. But declarations or admissions by an agent, of his own authority, and not accompanying the making of a contract, or the doing of an act, in behalf of his principal, nor made at the time he is. engaged in the transaction to which they refer, are not binding upon his principal, not being part of the "res gestae", and are not admissible in evidence, but come within the general rule of law, excluding hearsay evidence; being but an account or statement by an agent of what has passed or been done or omitted to be done,—not a part of the transaction, but only statements or admissions respecting it.' "

The language from the quotation from the Franklin Bank Case, which seems to fit the facts of this case, is that the so-called admissions of Livingstone appear to be the "account or statement by an agent of what has passed or been done or omitted to be done," and as agent Livingstone had no such authority to comment or give his idea of what Bridges had formerly agreed to do. The eighth assignment of error was well taken. The purported statements of Livingstone alleged to have been made on May 8, 1930, were highly prejudicial before a jury and alone would have to result in a reversal of this case.

The court gave an instruction which advised the jury that the issue was whether on the one hand the contract was as alleged by the plaintiff, or, on the other hand to scour and sell the wool within 60 days, and that plaintiff was to reimburse itself for its advances, expenses, charges, and commissions and not call on defendants for any

refund. We know of no evidence substantiating the allegation in the amended answer that the defendants were in no event to reimburse plaintiff. The testimony was that if the wool had been sold in 60 days the plaintiff could have reimbursed itself for all these charges and there would have remained a surplus for defendants. But neither the written instruments nor any testimony of purported conversations between Livingstone and Candland reveal any such agreement. The testimony of Candland that he "had a conversation with Livingstone to the effect that the expenses of handling that wool was to come out of the difference between what I received and what it was sold for" is not proper evidence to sustain such position. In the first place, it was not admissible under the principles heretofore announced to explain the purported ambiguity in the writings. Secondly, it gives no conversation, but conclusions. They may have been Livingstone's opinion as to what could be accomplished by a quick sale and not a commitment, Assignment No. 6, which attacks the admission of this evidence, is well taken. There was testimony that had it been sold such would have been the effect. The instruction was therefore erroneous. Assignment No. 14 is therefore well taken. Also assignments Nos. 15 and 16 directed to the same instruction. Assignments Nos. 1 to 7, both inclusive, attack rulings which we have already discussed.

The judgment of the lower court is set aside, and a new trial granted; appellant to recover costs.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.